# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59978-3-II |
| Respondent, | |
| v. | |
| JOEL ALBERT JOHNSON, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Joel A. Johnson appeals his convictions for two counts of attempted rape of a child, eight counts of child molestation, and one count of incest—each with an ongoing pattern of sexual abuse aggravator.  Johnson argues that (1) the trial court abused its discretion by denying Johnson's motion for a bill of particulars, (2) he received ineffective assistance of counsel, (3) the trial court erred by excluding testimony about why Johnson wrote an apology message, and (4) the trial court erred by admitting an out-of-court statement.  Johnson raises additional challenges in a statement of additional grounds (SAG).[1]

We hold that (1) the trial court did not abuse its discretion by denying Johnson's motion for a bill of particulars, (2) Johnson did not receive ineffective assistance of counsel, (3) the trial court did not err by excluding Johnson's testimony about why he wrote his apology message, and

---

[1]  RAP 10.10.

(4) the trial court did not err by admitting an out-of-court statement. We also hold that Johnson's SAG claims fail.[2] Accordingly, we affirm Johnson's convictions.

FACTS

A.   BACKGROUND

Johnson (born in 1985) is one of six children and grew up on a 30-acre property shared with extended family. The Johnson children were homeschooled for several years, and the family subscribed to a strict religion. Johnson's parents followed a "[s]trict religion cult thing" that believed men were superior to women and held "very bizarre and strange beliefs" including, "if [the sisters'] sleeves [were] too short [they] could put . . . thoughts in [their] brothers' or anyone's minds." 1 Verbatim Rep. of Proc. (VRP) (Oct 3, 2022) at 401; 2 VRP (Oct. 4, 2022) at 534. Johnson's parents also imposed additional rules on their daughters, S.J.K. and R.A.J., compared to their sons.

On June 30, 2015, S.J.K. (born in 1989) and R.A.J. (born in 1992) reported to the police that they were molested by their older brothers, Johnson and Nathan,[3] from early childhood to their teenage years. When S.J.K. and R.A.J. were in their twenties and Johnson and Nathan were in their thirties, the sisters reported the sexual abuse. Johnson and Nathan were separately charged based on S.J.K. and R.A.J.'s disclosures. Nathan pleaded guilty.

---

[2] The State filed a cross-appeal. In its cross-appeal, the State argues that the trial court erred by excluding Nathan's testimony that he abused S.J.K. and R.A.J. and pleaded guilty to two felony sex offenses. The State asks that we reverse the trial court's decision to exclude Nathan's testimony and that this testimony be allowed if this matter is remanded. However, because we affirm, we do not address the cross-appeal.

[3] Because Joel and Nathan have the same last name, we refer to Nathan by his first name where necessary to avoid confusion. We intend no disrespect.

On June 28, 2016, the State charged Johnson with one count of first degree child molestation. The State amended the information five times, and Johnson was ultimately charged in a fifth amended information with eleven counts:

Count 1: attempted second degree rape of a child against S.J.K. occurring on or between September 9, 1997, and September 8, 2003;

Count 2: attempted third degree rape of a child against S.J.K. occurring on or between September 9, 1997, and September 8, 2004;

Count 3: first degree child molestation against S.J.K. occurring on or between April 19, 1997, and September 8, 2001;

Count 4: second degree child molestation against S.J.K. occurring on or between September 9, 2000, and September 8, 2003;

Count 5: second degree child molestation against S.J.K. occurring on or between September 9, 2000, and September 8, 2003;

Count 6: second degree incest against S.J.K. occurring on or between September 9, 2002, and September 8, 2006;

Count 7: third degree child molestation against S.J.K. occurring on or between September 9, 1997, and September 8, 2002;

Count 8: first degree child molestation against R.A.J. occurring on or between April 19, 1997, and May 9, 2004;

Count 9: first degree child molestation against R.A.J. occurring on or between May 10, 1998, and May 9, 2000;

Count 10: second degree child molestation against R.A.J. occurring on or between May 10, 1999, and May 9, 2002; and

Count 11: second degree child molestation against R.A.J. occurring on or between May 9, 1999, and May 9, 2004.

Each count alleged the aggravating circumstances of ongoing pattern of sexual abuse, deliberate cruelty, and multiple current offenses (some unpunished).

B.    BILL OF PARTICULARS

On May 13, 2022, Johnson filed a CrR 2.1(c) motion for a bill of particulars directed at the second amended information.  In his motion, Johnson argued that the second amended information was "constitutionally deficient because it fail[ed] to provide complete notice of the essential elements of the offenses and underlying facts alleged."  Clerk's Papers (CP) at 514.

The trial court held a hearing on the motion on July 29, 2022.  During the hearing, the State informed the trial court that "full discovery has been provided by the State. . . . [The State has] given [the Defense] every single interview . . . . They have it all.  That is what the case is based on."  1 VRP (July 29, 2022) at 34.  Johnson conceded that "there's a lot of discovery in this case and the State has provided us everything they have, which I don't doubt," but argued that the voluminous discovery complicated matters.  1 VRP (July 29, 2022) at 40.

Discovery included several interviews with S.J.K. and R.A.J.  Although discovery addressed allegations against both Johnson and Nathan, S.J.K. and R.A.J. discussed incidents solely related to Johnson.

For example, S.J.K. disclosed that when she was between 12 and 14 years old, Johnson tried to rape her while they were in a bed in the attic.[4]  S.J.K. also discussed an incident when she was at the top of the attic stairs and Johnson restrained her, pulled down her pants, and tried to rape her.[5]  She stated that she was at least nine years old at the time.  When S.J.K. was between 7

---

[4]  Conduct supporting count 1.

[5]  Conduct supporting count 2.

and 10 years old, Johnson tied her down under a sheet and "touched [her] all over."[6]  Suppl. Ex. 30, at 1654.  S.J.K. explained that when she was around 12 to 13 years old and Johnson was about 16 years old, Johnson had a landscaping job.  Johnson offered to pay S.J.K. to come to work with him, and he touched her vagina and put her hand in his pants while they were in the car.[7]  Discussing how Johnson would "molest[] [her]" in the attic, S.J.K. stated that the touching was "[s]ometimes . . . the same," but "[s]ometimes when he came up there it was a little different" like when Johnson "made out with [her] with his braces."[8]  Suppl. Ex. 31, at 1726, 1727, 1729.  When S.J.K. was 16, she was on the computer in the attic when Johnson began touching her "[e]verywhere," including her vagina.[9]  Suppl. Ex. 30, at 1638.  S.J.K. also shared that they used to build forts with hay in the barn and that "[i]t happened in there."[10]  Suppl. Ex. 31, at 1742.

R.A.J. also discussed several incidents involving Johnson.  For example, R.A.J. stated that Johnson took her into the bathroom, undressed her, and rubbed his genitals on hers.[11]  In addition, R.A.J. stated that Johnson often took her to the woods near their house where he would "make [her] touch him. And he would touch [her.]"[12]  Suppl. Ex. 42, at 1804.  R.A.J. recalled that when

---

[6]  Conduct supporting count 3.

[7]  Conduct supporting count 4.

[8]  Conduct supporting count 5.

[9]  Conduct supporting count 6.

[10]  Conduct supporting count 7.

[11]  Conduct supporting count 8.

[12]  Conduct supporting count 9.

she was around 10 years old, Johnson made her touch him with his pants unzipped, and their father

almost caught them.[13]  And when R.A.J. was about 11 years old, the family went to the park and

Johnson brought R.A.J. behind some trees, kissed her, rubbed her vagina, and made her rub his

penis.[14]

On August 4, the trial court partially granted Johnson's motion for a bill of particulars,

ordering the State to provide notice of the facts supporting its special allegations of deliberate

cruelty in the second amended information.[15]  The trial court denied the motion for all other

charges and allegations, finding that "the State has provided the information available regarding

time and place of the allegations" and noting that "[e]ach [crime] is charged in the language of the

statute" and "[e]ach charge identifies a specific alleged victim."  CP at 566, 565.

The State subsequently provided a bill of particulars for the deliberate cruelty special

allegations related to Johnson's abuse of S.J.K.  For each charge with a deliberate cruelty allegation

related to S.J.K., the bill of particulars provided, in relevant part:

> Sometimes Defendant would assault [S.J.K.] while others were in the same room.
> Defendant assaulted [S.J.K.] so often that if [sic] felt normal and she felt like she would die.
> Defendant sexually assaulted [S.J.K.] in multiple rooms in the house and at multiple locations.  This includes virtually every room in the house, the defendant's car, the family car, the grandparents['] house, the barn, on camping trips.  He molested her multiple times under a plastic kid pool while seeming to play a family kids game.

---

[13]  Conduct supporting count 10.

[14]  Conduct supporting count 11.

[15]  The State included the deliberate cruelty special allegations in the second amended information and the fifth amended information.  However, during trial, the trial court later struck the deliberate cruelty special allegation on all counts.

CP at 571-75. Similarly, for the charges related to R.A.J.'s abuse, the State identified the same facts to support each deliberate cruelty allegation.

C.    TRIAL

1.    S.J.K.'s Testimony

S.J.K. testified that Johnson repeatedly touched her "in [her] private areas" "over a long period of time." 1 VRP (Sept. 26, 2022) at 300. She explained that her earliest memory of Johnson touching her occurred when she was five or six years old. S.J.K. also stated that it felt like Johnson touched her "[e]very day while he lived there." 1 VRP (Sept. 26, 2022) at 303. S.J.K. testified about several incidents of Johnson touching her inappropriately.

S.J.K. recalled a specific incident when she was either 12 or 13 years old when Johnson came into the attic, got on top of S.J.K., pulled her pants and underwear down to her ankles, and "tr[ied] to penetrate [her] . . . with his penis." 1 VRP (Sept. 26, 2022) at 307.

When S.J.K. was between 12 and 14 years old, she was standing at the top of the attic stairs when Johnson grabbed her from behind, pulled down her pants, and attempted to penetrate her with his penis.

Between 8 and 12 years old, S.J.K. was in the attic when Johnson undressed her and covered her with a sheet. S.J.K. testified that Johnson touched her vagina and touched "all over [her] whole body, underneath the sheet." 1 VRP (Sept. 26, 2022) at 305-06.

S.J.K. recalled that when she was about 12 or 13 years old, Johnson offered to pay her to go to his landscaping job with him. S.J.K. recounted that while they were in the car, Johnson put

his hand in her pants and touched the outside of her vagina "skin-to-skin" and put her hand on his penis "skin-to-skin." 1 VRP (Sept. 26, 2022) at 310.

She also testified that after she was 12 or 13 years old, Johnson began to kiss her occasionally. She recalled "the first time he stuck his tongue in [her] mouth" and explained that he rubbed her vagina during this incident. 1 VRP (Sept. 26, 2022) at 337.

When S.J.K. was 16 years old and Johnson was home from college, S.J.K. was using the computer in the attic when Johnson put his hands around her shoulders, put his hands down her pants, and touched her vagina.

And S.J.K. testified that when she was between 8 and 12 years old, the children were playing in the barn. S.J.K. and Johnson were alone in a hay tunnel, and Johnson put S.J.K.'s hand on his penis and his hand on her vagina.

On cross-examination, defense counsel asked S.J.K. about inconsistencies between her prior disclosures and her testimony at trial. For example, Johnson identified inconsistencies between her statements about how often the abused occurred and statements about whether Johnson had an erection during the incidents. Johnson also questioned S.J.K. about inconsistencies in her statements about family rules and beliefs.

2.      R.A.J.'s Testimony

R.A.J. also testified that Johnson often touched her inappropriately while she was growing up. R.A.J. stated that Johnson "would touch [her] genitals, and have [her] touch his." 1 VRP (Oct. 3, 2022) at 465. She testified about several instances when Johnson inappropriately touched her.

When R.A.J. was around 8 years old, Johnson led her into the bathroom. R.A.J. explained that Johnson took off their clothes and rubbed his erect penis on her vagina "skin to skin." 1 VRP (Oct. 3, 2022) at 468.

In addition, R.A.J. recalled that when she was around 7 years old, she and her siblings were playing in the woods. She explained that when she and Johnson were alone by the fern bushes, he made R.A.J. rub his penis, and he rubbed her genitals with his penis.

She also discussed one instance when she and Johnson were naked under some sheets in the attic. R.A.J. testified that her father walked upstairs while they were under the sheets and that she thought her father had caught them. She stated that she may have been about eight years old at the time.

R.A.J. further testified that when she was between 7 and 12 years old, she and her siblings were playing in the park when Johnson took her into the woods, unzipped his pants, and made her rub his penis with her hand. She testified that Johnson put his hand underneath her underwear and touched her vulva and clitoris "skin-to-skin." 1 VRP (Oct. 3, 2022) at 473.

During cross-examination, defense counsel questioned R.A.J. about inconsistencies between her prior statements and her testimony. Specifically, defense counsel presented evidence to contradict R.A.J.'s testimony that she did not recall writing correspondence to Johnson when they were still in contact. And defense counsel questioned R.A.J. about her inconsistent statements regarding family dynamics and rules.

3.      Evidentiary Challenges

Throughout trial, the parties disputed the admissibility of certain testimony. The State sought to exclude Johnson's testimony about R.A.J.'s drug use and sexual history to explain an

apology message from Johnson to S.J.K. Johnson objected to the admissibility of an out-of-court statement made by their mother that was elicited during S.J.K.'s testimony.

a. Johnson's apology

The State introduced an exhibit of social media messages between S.J.K. and Johnson from 2013. In Johnson's message to S.J.K., he wrote that he "spent almost as much time dreaming about the possibility of being allowed back as [he] ha[s] spent crying alone from the guilt and the pain [he] know[s] [he has] caused." Ex. 1, at 1433. Johnson further wrote, "my past still haunts me. . . . The apology I gave to you a long time ago maybe was poorly done, but it was absolutely sincere." Ex. 1, at 1433. Johnson did not further specify the reason for his apology, but he added, "I would like to give another apology even though it seems cheap as it doesn't actually take back anything that's already been done. But an apology is literally all I can do short of building a time machine." Ex. 1, at 1433. Johnson concluded by asking S.J.K. for advice regarding connecting with R.A.J.

Johnson's wife testified that she asked Johnson to write the message to "apologize for anything and everything" after S.J.K. began distancing herself and her child from Johnson's family. 2 VRP (Oct. 5, 2022) at 592. Johnson's brother, Matthew, testified that he helped Johnson write the letter because Johnson was "trying to clear out any areas of stress" as he started medical school. 2 VRP (Oct. 5, 2022) at 647.

Johnson objected to the introduction of the apology without allowing him to explain why he apologized. On multiple occasions, Johnson informed the trial court that if he chose to testify about the apology message to S.J.K., he would testify that he was apologizing for being judgmental of R.A.J.'s drug use and sexual history when she was younger. For example, Johnson argued that

"he was apologizing because he was so judgmental of [R.A.J.] when she was younger. You know, [R.A.J.] was a heroin addict" and "[R.A.J.] is also a hooker" because she has a pornography web page. 1 VRP (Oct. 3, 2022) at 442. Johnson contended that the State should not be allowed to argue that the apology message was "an apology about some sort of sex abuse" when the "real reason" for the apology was that Johnson previously "told [R.A.J.] to her face that she was a drug addicted prostitute" so he "wanted to make amends." 2 VRP (Oct. 6, 2022) at 748-49.

The State reminded the trial court that it had excluded discussions of witness' promiscuity and drug use during motions in limine. The State argued that "the apology is 90 percent directed to [S.J.K.]. And then at the end, he talks about wanting to apologize to [R.A.J.]." 2 VRP (Oct. 4, 2022) at 571.

The trial court stated that "every party gets a chance to try their case," but "[t]here are limits on what evidence can come in." 2 VRP (Oct. 6, 2022) at 750. The trial court explained that it excluded Johnson's comments about R.A.J.'s lifestyle choices "because of the type of information he might provide." 2 VRP (Oct. 6, 2022) at 750. Therefore, the trial court concluded that Johnson could argue he was judgmental about some of the choices R.A.J. made in her life, but he could not testify to the specifics, stating that "under any kind of evaluation of probative versus prejudicial, it fails." 2 VRP (Oct. 6, 2022) at 751.

Johnson subsequently testified that he wrote to S.J.K. because he wanted his daughter to stay connected with S.J.K. He had no reason to apologize to S.J.K. or R.A.J. for any sexual misconduct. And he explained that he regularly apologized in a melodramatic manner to his sisters and other family members. Johnson further testified that he was judgmental of both of his sisters' lifestyle choices.

11

b.       Out-of-court statement

Johnson challenged the admissibility of an out-of-court statement made by his mother that was elicited during S.J.K.'s testimony.  On direct examination, the State asked S.J.K. whether she had considered reporting to law enforcement when she was younger.  S.J.K. began to testify as to something her mother said, but the court sustained Johnson's hearsay objection to this testimony.  The State explained that the testimony would go to S.J.K.'s state of mind as to why she did not report.

Outside the presence of the jury, S.J.K. informed the trial court that she would testify that when she was 17 years old, her parents learned about Johnson sexually abusing her and R.A.J.  At that time, her mother told S.J.K. that they could go to the police "if [they] wanted to put [their] brothers in jail [for] the rest of their lives."  1 VRP (Sept. 26, 2022) at 338.  Ruling that the statement would not be considered hearsay because it was offered for S.J.K.'s state of mind, the trial court admitted the statement.  The trial court also provided the following limiting instruction to the jury:

> [Y]ou may consider the answer to the question only for the witness's state of mind at that time, and not for the truth of the matter asserted in the answer.

1 VRP (Sept. 26, 2022) at 344.

Johnson later requested that the trial court reconsider its ruling regarding S.J.K.'s testimony because the state of mind exception would be applicable to the declarant's state of mind, rather than the witness'.  In response, the trial court clarified that it ruled that "the statement was not hearsay under Rule 801."  2 VRP (Oct. 4, 2022) at 559.  Rather, the statement was admitted to

show S.J.K.'s "intent, or her mental state, of why she chose not to act in [a] certain way," not under ER 803(a)(3) for then-existing emotional state. 2 VRP (Oct. 4, 2022) at 559.

### 4. Closing Arguments

During closing arguments, the State elected a specific act for each crime charged. The State made the following elections related to S.J.K.'s testimony. The State elected the incident with S.J.K. in the attic during which Johnson pulled her pants and underwear down and rubbed his penis against her vagina as conduct supporting count 1. The State elected Johnson pinning S.J.K. above the stairway in the attic and trying to penetrate her as conduct supporting count 2. As to count 3, the State relied on S.J.K.'s testimony about Johnson taking her clothes off and touching her vagina in the attic. For count 4, the State identified when S.J.K. went to Johnson's landscaping job with him and Johnson touched her vagina in the truck. The State relied on the incident when Johnson kissed S.J.K. and rubbed her bare vagina with his hand as conduct supporting count 5. As to count 6, the State identified when S.J.K. was on the computer in the attic and Johnson rubbed her vagina skin-to-skin. And for count 7, the State relied on the incident in the hay tunnel when Johnson put S.J.K.'s hand onto his penis and touched her vagina.

The State made the following elections related to R.A.J.'s testimony. For count 8, the State relied on the incident when R.A.J. was in the bathroom, and Johnson took off their clothes and rubbed his penis against her vagina. As to count 9, the State identified when Johnson and R.A.J. were in the woods, and Johnson put his hand in her pants and rubbed her vagina skin to skin. The State relied on the incident in the attic where their father almost caught Johnson putting his hand down R.A.J.'s pants and rubbing her vagina as conduct supporting count 10. And as to count 11,

the State identified the incident in the park when Johnson rubbed R.A.J.'s vagina and made her rub his penis.

Also during the State's closing argument, the prosecutor "submit[ted] that [S.J.K.] and [R.A.J.] were very credible witnesses." 2 VRP (Oct. 10, 2022) at 856. He argued, "[t]hey were honest and open about what they could remember or couldn't remember," and "it's up to [the jury] to determine whether they're being truthful or credible . . . but the State submit[s] that they were also very credible in their description of when these things would occur." 2 VRP (Oct. 10, 2022) at 856. The prosecutor continued to discuss their credibility, asking the jury to consider "[w]hat is a child to do? How does a victim act? . . . The Defense is saying: don't find them credible because they didn't keep a running log of every sexual assault that occurred to them from the ages of 5 all the way up to when it ended." 2 VRP (Oct. 10, 2022) at 901.

The prosecutor also asked the jury to consider the credibility of defense witnesses. For example, the prosecutor argued, "The State would submit that's not true [that they are very credible] for the Defense witnesses." 2 VRP (Oct. 10, 2022) at 857. And the "State submits that the cross-examination of [defense] witnesses was very light handed. . . . But the witnesses didn't want to answer the questions they were asked. They were evasive, . . . [a]rgumentative." 2 VRP (Oct. 10, 2022) at 857-58. The prosecutor also contended, "The State would submit that [Johnson's wife's] emotions did not seem consistent with her testimony. She was able to turn a little bit of tears on when she was talking about the impact of her family." 2 VRP (Oct. 10, 2022) at 893. Further, the State characterized testimony from Johnson's wife that Johnson did not know what a vagina was at 19 or 20 years old as "absurd." 2 VRP (Oct. 10, 2022) at 893. The State also

reminded the jury that "[the jury] determine[s] credibility" and that "[counsels'] opinions don't matter." VRP (October 10, 2022) at 893.

5. Verdict

The jury found Johnson guilty on all eleven counts. The jury also found the aggravators of ongoing pattern of sexual abuse alleged in each count applied.

Johnson appeals and the State cross-appeals.[16]

ANALYSIS

Johnson argues that (1) the trial court abused its discretion when it denied his motion for a bill of particulars, (2) he received ineffective assistance of counsel because his trial counsel did not impeach S.J.K. and R.A.J. about inconsistencies regarding their ages at the time of the sexual abuse in their statements made in their interviews and their testimonies at trial, (3) the trial court erred when it excluded his proposed testimony explaining his apology, and (4) the trial court erred by allowing S.J.K. to testify about an out-of-court statement made by her mother. Johnson also raises additional claims in a SAG.

A. BILL OF PARTICULARS

Johnson argues that the trial court abused its discretion when it denied his motion for a bill of particulars. We disagree.

1. Legal Principles

Criminal defendants have "'a constitutional right to be informed of the nature and cause of the accusation against [them]'" such that they can prepare a defense. *State v. Turner*, 167 Wn.

---

[16] As noted in FN 2, because we affirm Johnson's convictions, we do not address the State's cross-appeal.

App. 871, 879, 275 P.3d 356 (2012) (quoting *State v. Bergeron*, 105 Wn.2d 1, 18, 711 P.2d 1000 (1985)). A bill of particulars is intended to "amplify or clarify particular matters essential to the defense." *Id.* (quoting *State v. Holt*, 104 Wn.2d 315, 321, 704 P.2d 1189 (1985)).

"'The test in passing on a motion for a bill of particulars should be whether it is necessary that defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.'" *State v. Noltie,* 116 Wn.2d 831, 845, 809 P.2d 190 (1991) (quoting 1 C. Wright, *Federal Practice* § 129, at 436-37 (2d ed.1982)). If the information needed to adequately prepare for trial is provided in the information, then no bill of particulars is required. *Id.* Nor is a bill of particulars necessary if the government has provided the information sought in some other form. *Id.*

Whether a bill of particulars is required is within the discretion of the trial court. *Id.* at 844. Thus, the trial court's ruling will not be disturbed absent a showing of abuse of discretion. *Id.* There is an abuse of discretion when the trial court's decision "'is manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

2.      Denial of Bill of Particulars

Johnson argues that he could not adequately prepare his defense because the second amended information did not allege the nature and extent of the charged crimes and because discovery did not provide clarity. This issue is moot because Johnson filed a motion for a bill of particulars directed at the second amended information, and he was ultimately convicted based on the fifth amended information. *See State v. Eaton*, 164 Wn.2d 461, 466, 191 P.3d 1270 (2008)

16

("[O]nce the State formally amends the information, the new information stands in lieu of the original, which is deemed quashed, abandoned, or superseded.").

However, even if the issue is not moot, Johnson's challenge fails. In the motion for a bill of particulars, Johnson argued that the information "fail[ed] to provide complete notice of the essential elements of the offenses and the underlying facts alleged." CP at 514. But Johnson was not entitled to a bill of particulars because the information sought was available to Johnson in the charging document and through the discovery process. The information provided date ranges, specified alleged victims, and included the language of the statute for each crime charged.

Further, the State had already provided discovery materials to Johnson that included the information Johnson sought in the bill of particulars. During the hearing on the motion, the State informed the trial court that "full discovery has been provided by the State. . . . [The State has] given [Johnson] every single interview . . . . They have it all. That is what the case is based on." 1 VRP (July 29, 2022) at 34. Johnson conceded that "there's a lot of discovery in this case and the State has provided us everything they have, which I don't doubt," but Johnson argued that the voluminous discovery complicated matters. 1 VRP (July 29, 2022) at 40.

Although discovery may have been voluminous, S.J.K. and R.A.J.'s interviews provided specific instances upon which the charges were based. The State could not have provided anything more; it could not provide information it did not have. Also, the information provided a date range for the crimes charged, specified victims, and the language of the statute for the crimes charged. Thus, because the State included the necessary information in the charging document and provided full discovery of information upon which it based the charges, Johnson had the information necessary to adequately prepare for trial.

Moreover, Johnson cannot show that he was prejudicially surprised. Johnson argues that he was prejudiced because he was convicted of second degree child molestation for the incident involving kissing S.J.K.—"a count for which he had almost no information from discovery." Br. of Appellant at 28. Johnson argues that he "had no notice that a kissing incident would be the basis for any criminal charge." Br. of Appellant at 29. However, Johnson cannot show that he was prejudicially surprised because the underlying facts were provided in discovery. While discussing how Johnson would "molest[] [her]" in the attic, S.J.K. stated that the touching was "[s]ometimes . . . the same" whereas "[s]ometimes when he came up [to the attic] it was a little different." Suppl. Ex. 31, at 1726, 1727. When asked to provide an example of how it was different, she stated that he "made out with [her] with his braces." Suppl. Ex. 31, at 1729. Accordingly, Johnson cannot show that he was prejudicially surprised because the factual basis for this charge was provided in discovery.

Johnson also argues that he was prejudicially surprised by new information about the victims' ages at trial. Specifically, Johnson argues that he was prejudicially surprised because he had no notice of S.J.K.'s age for counts 2 and 7 and R.A.J.'s age for counts 8 and 9. However, the fifth amended information provided the relevant date ranges, and therefore the victims' ages, for these charges. *See Noltie*, 116 Wn.2d at 845 ("Nothing in the record indicates what information, beyond that provided to the defense, could have been furnished to give additional notice of the charges."). Accordingly, because the State gave notice of the allegations and Johnson cannot show that he was prejudicially surprised at trial, the trial court did not abuse its discretion in denying Johnson's motion for a bill of particulars.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Johnson argues that he received ineffective assistance of counsel because his defense counsel failed to cross-examine S.J.K. and R.A.J. about inconsistencies as to their ages in their interviews and testimonies at trial.  We disagree.

1.     Legal Principles

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel.  *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).  To prevail on an ineffective assistance of counsel claim, the appellant must show that defense counsel's performance was deficient and that the deficient representation caused prejudice.  *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024); *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Counsel's performance is deficient when it "falls 'below an objective standard of reasonableness.'"  *Estes*, 188 Wn.2d at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).  But counsel's performance is not deficient when the conduct can be characterized as legitimate strategy or tactics.  *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).  We strongly presume that defense counsel's performance was reasonable.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014).  "A criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'"  *Id.* (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).  A criminal defendant "'must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by

counsel.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *McFarland*, 127 Wn.2d at 336).

To show prejudice, the appellant must show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). A reasonable probability is that which is "'sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

2.    Cross-Examination of S.J.K. and R.A.J.

Johnson argues that he received ineffective assistance of counsel because his defense counsel failed to cross-examine S.J.K. and R.A.J. about inconsistent statements made in their interviews and their testimonies at trial regarding their ages at the time of the sexual abuse. We disagree.

Cross-examination is entrusted to the professional discretion of counsel. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). While hindsight may allow this court to "'speculate as to whether another attorney could have more efficiently attacked the credibility of . . . witnesses[,] . . . [t]he extent of cross-examination is something a lawyer must decide quickly and in the heat of the conflict. This . . . is a matter of judgment and strategy.'" *Id.* (some alterations in original) (quoting *State v. Stockman,* 70 Wn.2d 941, 945, 425 P.2d 898 (1967)).

Courts need not determine trial counsel's reasons for not cross-examining witnesses if counsel's approach is within the range of reasonable representation. *Id.* "A decision not to cross examine a witness is often tactical because counsel may be concerned about opening the door to damaging rebuttal or because cross examination may not provide evidence useful to the defense."

*In re Pers. Restraint of Brown*, 143 Wn.2d 431, 451, 21 P.3d 687 (2001). "[E]ven a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998). To establish prejudice from an ineffective cross-examination, the appellant must "demonstrate how . . . testimony on cross-examination could have overcome the . . . evidence against him." *Davis*, 152 Wn.2d at 720.

Johnson contends that he received ineffective assistance of counsel because his trial counsel did not cross-examine S.J.K. and R.A.J. about the inconsistencies in their reported ages for some of the incidents between their interviews and trial testimony. However, cross-examination is entrusted to the discretion of counsel such that we need not determine defense counsel's reasons for not cross-examining witnesses if the approach is within the reasonable range of representation. *Id.*

Here, the record shows that defense counsel's strategy on cross-examination was to attack S.J.K. and R.A.J.'s credibility based on other inconsistencies. For example, defense counsel attempted to impeach S.J.K. and R.A.J. based on S.J.K.'s prior statements about the frequency of abuse, the details of their abuse allegations, R.A.J.'s prior communications with Johnson, and their characterizations of their family dynamics and rules. Defense counsel's decision on the topics with which to impeach the victims was within the reasonable range of representation and provided the jury with a basis to question S.J.K. and R.A.J.'s credibility.

Moreover, we strongly presume defense counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33. Johnson fails to rebut this presumption by showing the absence of legitimate strategy or tactical reasons supporting defense counsel's decision not to impeach S.J.K. and R.A.J. on alleged discrepancies in their reported ages at the time of the abuse between their interviews

and their testimonies. Johnson merely argues that counsel could have employed alternative strategies, but he does not show that counsel's representation was devoid of any legal strategy or tactic. Johnson merely contends that there was no strategic reason not to question S.J.K. and R.A.J. because "[t]his questioning did not need to be combative; counsel could point to the prior statements and ask if the witness could have been a different age." Br. of Appellant at 44. Merely stating that defense counsel should have raised the discrepancies to present memory and credibility questions to the jury is insufficient to show the absence of any legitimate strategy or trial tactic, especially when the record shows that counsel chose to impeach the victims on other clear inconsistencies. Accordingly, Johnson's ineffective assistance of counsel claim fails.

C.    JOHNSON'S TESTIMONY

Johnson argues that the trial court violated his constitutional right to present a defense because he was prohibited from testifying about his reasons for writing the apology. We disagree.

1.    Legal Principles

Both the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee the criminal defendant's right to present a defense. *State v. Starbuck*, 189 Wn. App. 740, 750, 355 P.3d 1167 (2015), *review denied*, 185 Wn.2d 1008 (2016). We apply a two-step review of evidentiary rulings that involve a defendant's constitutional right to present a defense. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021).

First, we examine whether the trial court abused its discretion regarding the evidentiary ruling. *Id.* A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *Id.* at 799. "A reviewing court may not find abuse of discretion simply because

it would have decided the case differently—it must be convinced that 'no reasonable person would take the view adopted by the trial court.'" *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) (internal quotation marks omitted) (quoting *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)).

Second, we review de novo whether that ruling violated the defendant's right to present a defense. *Arndt*, 194 Wn.2d at 797-98. It is not a violation of the defendant's right to present a defense if the defendant is still able to present relevant evidence to support their central defense theory. *Id.* at 814.

2. Exclusion of Testimony Explaining Reasons For Johnson's Apology

Johnson argues that the trial court abused its discretion by excluding his testimony about why he apologized to S.J.K. and R.A.J. because the testimony would not be excluded under Washington's rape shield law or ER 403. We disagree.

Under the rape shield statute, a victim's past sexual behavior is inadmissible on the issues of credibility or consent. RCW 9A.44.020(2). Although the trial court excluded testimony about R.A.J.'s sexual history, the record does not show that the court relied on the rape shield law to exclude Johnson's testimony as it pertains to Johnson's apology message.

Rather, the record shows that the trial court relied on ER 403. *See* 2 VRP (Oct. 6, 2022) at 751 ("I think that under any kind of evaluation of probative versus prejudicial, it fails."). Although relevant evidence is generally admissible under ER 402, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. Relevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence. ER 401. Evidence is

23

unfairly prejudicial when it is likely to evoke an emotional response rather than a rational decision. *State v. Scherf*, 192 Wn.2d 350, 388, 429 P.3d 776 (2018).

Here, the trial court excluded Johnson's testimony about R.A.J.'s drug use and sexual history, instructing that Johnson could argue he was judgmental about her choices, but Johnson could not "get into the specifics." 2 VRP (Oct. 6, 2022) at 571. Johnson argues that evidence of R.A.J.'s drug use and sexual history was more probative than prejudicial because it would have allowed Johnson to refute the State's narrative that the message was an apology for sexual abuse. Johnson further argues that the risk of unfair prejudice was low because calling R.A.J. a "'drug addicted prostitute'" was necessarily inflammatory to show Johnson's need to apologize so profusely. Br. of Appellant at 59.

Here, the trial court balanced the probative value of the proposed testimony with unfair prejudice and determined that "under any kind of evaluation of probative versus prejudicial, it fails." 2 VRP (Oct. 6, 2022) at 751. Johnson's proposed testimony arguably has some probative value with regard to his apology to S.J.K. because the evidence could bolster Johnson's claim that he was not apologizing for sexual abuse. However, the evidence Johnson sought to introduce was provocative. Johnson's proposed testimony included references to R.A.J.'s heroin addiction and her pornography website, which Johnson framed as R.A.J. being "a hooker." 1 VRP (Oct. 3, 2022) at 442. The proposed evidence also included testimony that Johnson called R.A.J. a "drug addicted prostitute." 2 VRP (Oct. 6, 2022) at 749. The proposed testimony about R.A.J.'s heroin use, pornography website, and prostitution was clearly meant to evoke an emotional response in the jury. Moreover, Johnson's proposed testimony was related to R.A.J.; there was no probative value of the proposed testimony with regard to his apology to S.J.K.

The trial court balanced the probative value of Johnson's proposed testimony and the danger of unfair prejudice and concluded that "under any kind of evaluation of probative versus prejudicial, it fails." 2 VRP (Oct. 6, 2022) at 751. But, rather than exclude Johnson's testimony entirely, the trial court allowed Johnson to testify that he was judgmental about some of the choices R.A.J. made in her life without testifying about the specifics. This was a reasonable determination. Thus, the trial court did not abuse its discretion in limiting Johnson's testimony.

3.      Johnson's Right to Present a Defense

Because we conclude that the trial court did not abuse its discretion by excluding Johnson's testimony as to R.A.J.'s drug use and sexual history, we next consider whether the trial court violated Johnson's right to present a defense.

The constitutional right to present a defense protects a defendant's ability to defend against the State's accusations. *State v. Jennings*, 199 Wn.2d 53, 66, 502 P.3d 1255 (2022). However, defendants have "no constitutional right to present irrelevant evidence," such that the evidence presented must be at least minimally relevant to implicate the right to present a defense. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). If the evidence is relevant, this court applies the *Hudlow*[17] test to determine if excluding the evidence violates the defendant's constitutional rights. 99 Wn.2d 1, 16, 659 P.2d 514 (1983); *Jennings*, 199 Wn.2d at 63. Under *Hudlow*, "'the integrity of the truthfinding process and [a] defendant's right to a fair trial' are both important considerations." *Jennings*, 199 Wn.2d at 66 (alteration in original) (quoting *Hudlow*, 99 Wn.2d at 14).

---

[17] *State v. Hudlow*, 99 Wn.2d 1, 659 P.2d 514 (1983).

Johnson's testimony as to the reason why he wrote the apology is at least "minimally relevant" to his defense because it would have allowed him to refute the claim that the apology was for sexual abuse. *See Jones*, 168 Wn.2d at 720. Because this evidence is at least minimally relevant, we must weigh the State's interests with Johnson's need to present the evidence.

Under the *Hudlow* test, we weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence. *Jennings*, 199 Wn.2d at 63. We examine whether the evidence was of such "'extremely high probative value'" that it constitutes the defendant's entire defense, or whether the defendant still has the opportunity to present a defense without such evidence. *Arndt*, 194 Wn.2d at 813 (quoting *Jones*, 168 Wn.2d at 721).

"[E]vidence of 'extremely high probative value . . . cannot be barred without violating the Sixth Amendment.'" *Jennings*, 199 Wn.2d at 65 (second alteration in original) (quoting *Jones*, 168 Wn.2d at 724). We distinguish between evidence that "merely bolsters credibility" from evidence that is "necessary to present a defense." *Id.* at 66-67. "The balance more often tips against a constitutional violation when a defendant asserts a . . . violation based on evidentiary limitations imposed on a defense that is otherwise presented and developed." *State v. Caril*, 23 Wn. App. 2d 416, 431, 515 P.3d 1036 (2022*), review denied*, 200 Wn.2d 1025, *cert. denied*, 144 S. Ct. 125 (2023).

Johnson argues that the testimony was crucial because it would have allowed him to contradict the narrative that his apology message was "a veiled confession." Br. of Appellant at 62. The State argues that the testimony would have been a "character assassination of a child

sexual assault victim" that would be "more likely to provoke an emotional response than a rational decision" without rebutting a particular incident of abuse. Br. of Resp't at 46.

Here, Johnson's testimony about R.A.J.'s drug use and sexual lifestyle was not of such high probative value that its exclusion would violate his Sixth Amendment rights. And the proposed testimony was not necessary because Johnson was otherwise able to develop his defense. For example, the trial court allowed Johnson to testify as to his own conduct that led him to write the apology. Further, Johnson's wife and brother testified about Johnson's reasons for writing the apology message. Also, Johnson's proposed testimony would not have rebutted any particular incident of abuse. Johnson's proposed evidence would have merely bolstered his defense—it was not necessary to his defense. *See Jennings*, 199 Wn.2d at 66-67. As a result, Johnson's need to present this evidence would not outweigh the State's interest in avoiding "an emotional response [rather] than a rational decision" from the jury and protecting child sexual assault victims. Br. of Resp't at 46. Accordingly, Johnson's right to present a defense was not violated.

D.     ADMITTING AN OUT-OF-COURT STATEMENT

Johnson further argues that the trial court erred by allowing S.J.K. to testify about her mother's out-of-court statement. Johnson appears to contend that the statement was erroneously admitted for the "truth of the matter" that Johnson was guilty. We disagree.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is generally inadmissible unless it falls within a recognized exception to the hearsay rule. ER 802. "'Out-of-court statements offered to show their effect on the listener, regardless of their truth, are not hearsay.'" *State v. Heutink*, 12 Wn. App. 2d 336, 356-57, 458 P.3d 796, (quoting *Henderson v. Tyrrell*, 80 Wn. App. 592, 620, 910 P.2d 522 (1996)),

*review denied*, 195 Wn.2d 1027 (2020). We review de novo whether a statement constitutes hearsay. *State v. Carte*, 27 Wn. App. 2d 861, 877-78, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024).

Here, S.J.K. testified that she did not report to law enforcement when she was younger because her mother told her that they could go to the police "if [they] wanted to put [their] brothers in jail [for] the rest of their lives." 1 VRP (Sept. 26, 2022) at 338. The trial court ruled that "the statement was not hearsay under Rule 801." 2 VRP (Oct. 4, 2022) at 559. The trial court further clarified that it did not admit the statement under the hearsay exception for then-existing mental, emotional, or physical conditions. Rather, the statement explained S.J.K.'s "intent, or her mental state, of why she chose not to act in [a] certain way." 2 VRP (Oct. 4, 2022) at 559.

Here, contrary to Johnson's argument, the out-of-court statement made by S.J.K.'s mother was not offered for the truth of the statement—that S.J.K. and R.A.J.'s brothers would go to jail for the rest of their lives if the sisters went to the police. Rather, the testimony was used to show the effect of the statement on S.J.K.—why she did not report to law enforcement sooner. Further, the trial court instructed the jury that it could consider the statement "only for [S.J.K.'s] state of mind at that time, and not for the truth of the matter asserted in the answer." 1 VRP (Sept. 26, 2022) at 344. The trial court did not err.

E.      STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

Under RAP 10.10(a), criminal defendants may "file a pro se statement of additional grounds for review to identify and discuss those matters related to the decision under review." In his SAG, Johnson claims: (1) the prosecutor committed misconduct by violating the trial court's

order for a bill of particulars, (2) the prosecutor committed misconduct by commenting on the credibility of witnesses, and (3) he is entitled to a new trial due to cumulative error.

1.      Violation of Order for Bill of Particulars

Johnson claims that the prosecutor committed misconduct by violating the trial court's order for a bill of particulars because it "copied and pasted boilerplate allegations for each case." SAG at 1.  We disagree.

As discussed above, this issue is moot because Johnson's motion for a bill of particulars was directed at the second amended information, and he was ultimately convicted based on the fifth amended information.  *See Eaton*, 164 Wn.2d at 466 ("[O]nce the State formally amends the information, the new information stands in lieu of the original, which is deemed quashed, abandoned, or superseded.").

Moreover, the issue is moot because the trial court's order required the State to respond with a bill of particulars relating to the deliberate cruelty special allegations.  However, the trial court dismissed all deliberate cruelty special allegations, and the jury was not instructed nor entered any verdict on the special allegations of deliberate cruelty.

However, even if the issue is not moot, this claim fails because the State filed a proper bill of particulars.

CrR 2.1 requires the information to be "a plain, concise and definite statement of the essential facts constituting the offense charged."  *State v. Maurer*, 34 Wn. App. 573, 577, 663 P.2d 152 (1983).  A bill of particulars is "intended to amplify [the information] and to aid the defendant in the preparation of a proper defense."  *Id.*

The trial court denied Johnson's motion for a bill of particulars except as to the alleged deliberate cruelty aggravator for each count. The State provided the factual bases on which it relied for each count supporting its special allegations of deliberate cruelty. For example, the State's bill of particulars provided:

> Sometimes Defendant would assault [S.J.K.] while others were in the same room.
> Defendant assaulted [S.J.K.] so often that if [sic] felt normal and she felt like she would die.
> Defendant sexually assaulted [S.J.K.] in multiple rooms in the house and at multiple locations. This includes virtually every room in the house, the defendant's car, the family car, the grandparents['] house, the barn, on camping trips. He molested her multiple times under a plastic kid pool while seeming to play a family kids game.

CP 571-75. Because the State amplified the information by providing the essential facts on which it relied to support the allegations of deliberate cruelty, the State did not violate the trial court's order. And because the State did not violate the trial court order, there was no misconduct. Accordingly, this claim fails.

2.      Comments on Witness Credibility

Johnson next claims that the prosecutor committed misconduct by making improper comments on witness credibility. Johnson did not object to any of the statements he claims were improper at trial.

To prevail on a claim of prosecutorial misconduct, the defendant must show that "'the prosecutor's conduct was both improper and prejudicial.'" *State v. Restvedt*, 26 Wn. App. 2d 102, 126, 527 P.3d 171 (2023) (quoting *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012)). "[I]f the defendant did not object at trial, 'the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have

cured the resulting prejudice.'" *Id.* (quoting *Emery*, 174 Wn.2d at 760-61). The defendant must show that no curative instruction would have prevented any prejudicial effect and that the prejudice had a substantial likelihood of affecting the jury verdict. *Emery*, 174 Wn.2d at 761.

Johnson asserts that the State committed "clear prejudicial misconduct when [the prosecutor] spent a considerable portion of his closing argument bolstering the complaining witnesses' testimony and attacking Mr. Johnson's credibility." SAG at 3. Johnson identifies several incidents of alleged misconduct during the State's closing argument.

### a. Alleged improper conduct

Johnson argues that the State committed "clear prejudicial misconduct when [the prosecutor] spent a considerable portion of his closing argument bolstering the complaining witnesses' testimony and attacking Mr. Johnson's credibility." SAG at 3. We disagree.

Prosecuting attorneys enjoy wide latitude when making a closing argument. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). However, it is improper for a prosecutor to express their personal opinion on a witness' credibility or a defendant's guilt. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). It must be clear and unmistakable that the prosecutor is expressing a personal opinion. *State v. McKenzie*, 157 Wn.2d 44, 54, 134 P.3d 221 (2006); *see also Lindsay*, 180 Wn.2d at 438 (holding the statement "the most ridiculous thing I've ever heard" was improper and highlighting that "I've ever heard" was an obvious expression of personal opinion as to credibility). In addition, prosecutors may comment on witness credibility based on the evidence. *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). A prosecutor may also present reasons why a jury should believe one witness over another. *State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996). We review alleged prosecutorial misconduct in the context

of the whole argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. *Emery*, 174 Wn.2d at 764 n.14.

First, Johnson claims that it was improper for the State to argue that S.J.K. and R.A.J. were credible. Specifically, Johnson highlights statements such as, "'[t]he State submits that [S.J.K.] and [R.A.J.] were very credible witnesses,'" "'[t]hey were honest and open about what they could remember and what they couldn't remember,'" and "'it is up to you to determine whether they are being truthful or credible . . . but the [S]tate submits that they were also very credible in their description of when these things would occur.'" SAG at 3 (some alterations in original) (quoting 2 VRP (Oct. 10, 2022) at 856.)

The State's arguments that the jury should find S.J.K. and R.A.J. credible were not improper because the prosecutor did not express a personal opinion. Rather than expressing a clear and unmistakable personal opinion as in *Lindsay*, the State prefaced its arguments from the evidence with "the State submits." *Compare Lindsay*, 180 Wn.2d at 438 ("the most ridiculous thing I've ever heard") *with* 2 VRP (Oct. 10, 2022) at 856 ("the State submits"). Because the State's comments on S.J.K. and R.A.J.'s credibility were not personal opinions, the State's arguments were not improper.

Next, Johnson claims that the State "suggest[ed] to the jury [S.J.K. and R.A.J.] acted and looked like child victims." SAG at 4. However, Johnson misconstrues the State's argument. Taken in context, the State argued that S.J.K. and R.A.J. were credible and referenced their testimony. *See* 2 VRP (Oct. 10, 2022) at 901 ("What is a child to do? . . . The Defense is saying: don't find them credible because they didn't keep a running log of every sexual assault that occurred to them from the ages of 5 all the way up to when it ended."). This argument did not put

forth any personal opinion. Instead, the State merely argued that S.J.K. and R.A.J. were still credible despite inconsistencies in their testimony. This argument commented on witness credibility based on the evidence. Accordingly, the State's argument was not improper.

Johnson also claims that the State's arguments relating to the defense witnesses' credibility were improper. Johnson identifies specific statements including, "'[t]he [S]tate would submit that's not true [that they are very credible] for the defense witnesses,'" "'[l]et's think about credibility,'" "[t]he State would submit that [Johnson's wife's] emotions did not seem consistent with her testimony. She was able to turn a little bit of tears on" and "[s]he didn't want to answer [the State's] questions." SAG at 3-4 (alterations in original) (quoting 2 VRP (Oct. 10, 2022) at 893); 2 VRP (Oct. 10, 2022) at 893. Johnson also claims the following argument was improper: "[The] State submits that the cross-examination of [defense] witnesses was very light handed. . . . But the witnesses didn't want to answer the questions they were asked. They were evasive, . . . [a]rgumentative." 2 VRP (Oct. 10, 2022) at 857-58. And Johnson identifies the State's argument that "'the [D]efendant's explanation of the . . . apology is also not credible.'" SAG at 4 (quoting 2 VRP (Oct. 10, 2022) at 895-96).

These arguments were not personal opinions on witness credibility. And these arguments were based on the defense witnesses' demeanor and testimony or on the prosecutor's description of their own conduct during cross-examination of the witnesses. Thus, these arguments were not improper.

Finally, Johnson claims that "[t]he prosecutor's constant comments on the credibility of witnesses, along with the inflammatory rhetoric like 'absurd,' went far beyond the misconduct deemed flagrant and ill-intentioned in Lindsay, 180 Wn.2d at 438." SAG at 5. In *Lindsay*,

33

however, the State expressed a clear and unmistakable personal opinion, arguing that certain testimony was "the most ridiculous thing I've ever heard." 180 Wn.2d at 438. Further, in *Lindsay*, the Supreme Court discussed *State v. Anderson*, 153 Wn. App. 417, 430, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010), recognizing that "words like 'ridiculous' or 'preposterous' in relation to testimony are not, alone, an improper expression of personal opinion as long as the prosecutor is arguably drawing an inference from the evidence." *Lindsay*, 180 Wn.2d at 438.

Here, the State argued, "That's absurd," to the suggestion that Johnson did not know what a vagina was at 19 years old. VRP (Oct. 10, 2022) at 893. The State's standalone comment that the testimony was "absurd" was akin to *Anderson*, such that this comment is not a personal opinion so long as it was arguably drawing an inference from the evidence. The State's comment was based on the testimony that Johnson had extremely limited sexual knowledge in his early adulthood. However, even if these arguments were improper, Johnson fails to show prejudice.

        b.     No prejudice shown

Because Johnson did not object at trial, he must show that the prosecutor's conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Restvedt*, 26 Wn. App. 2d at 126 (quoting *Emery*, 174 Wn.2d at 760-61). To show conduct is flagrant and ill intentioned, Johnson must show that no curative instruction would have prevented any prejudicial effect and that the prejudice had a substantial likelihood of affecting the jury verdict. *Emery*, 174 Wn.2d at 761.

Johnson claims that "the State's conduct was flagrant and ill-intentioned" and that "prejudice is manifest" because "credibility was the true issue in this case." SAG at 4-5. However, Johnson fails to show that no curative instruction would have prevented any alleged prejudicial

effect. If Johnson had objected at trial, the trial court could have stricken the remarks from the record or instructed the jury that they are to decide the case on the evidence presented at trial, the attorneys' arguments are not evidence, and the jury is solely responsible for determining witness credibility. WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02 (5th Ed. 2024). Juries are presumed to follow the court's instructions. *Id.* at 766. Thus, a curative instruction would have eliminated any risk that that Johnson alleges. Because a curative instruction would have cured any prejudicial effect, the State's conduct was not flagrant and illintentioned. Accordingly, Johnson's prosecutorial misconduct claim fails.

3.    Cumulative Error

Finally, Johnson claims that he is entitled to a new trial due to cumulative error. We disagree.

The cumulative error doctrine applies when a combination of trial errors effectively denies the defendant the right to a fair trial, even if any one of the errors alone may not justify reversal. *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015), *review denied*, 185 Wn.2d 1008 (2016). The defendant bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of the trial. *Id.*

Here, because we conclude that there was no error, the cumulative error doctrine does not apply. Accordingly, Johnson's cumulative error claim fails.

CONCLUSION

We hold that (1) the trial court did not abuse its discretion by denying Johnson's motion for a bill of particulars, (2) Johnson did not receive ineffective assistance of counsel, (3) the trial court did not err by excluding Johnson's testimony about why he wrote his apology message, and

(4) the trial court did not err by allowing S.J.K. to testify about an out-of-court statement her mother made. We also hold that Johnson's SAG claims fail. Accordingly, we affirm Johnson's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Veljacic, A.C.J.

Price, J.